UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

DARREN L. WILLIAMS                )
Plaintiff                         )
                                  )
v.                                )   Case No. 20-3277-SAC
                                  )
JEFF ZMUDA, et al.,               )
Defendants                        )

MOTION TO REQUEST DENIAL OF DEFENDANTS' REQUEST
FOR DISMISSAL OR SUMMARY JUDGEMENT

Comes now Darren L. Williams, Plaintiff in Case No. 20-3277-SAC

pertaining to Defendants' Motion to Dismiss, or in Alternative,

for Summary Judgement.

STATEMENT OF FACTS

Defendants make several assertions as 'material fact' in their

filing that bear scrutiny.

1.) Defendants state in #5 that current versions of IMPP 11-115A

do not hold that SO's must complete SOTP for serious override

consideration, yet on their official application form in the

November 2020 revision, it is clearly considered (attached).

Further, the form itself still contains nothing but questions

regarding contact with minors, as does the whole of the revision

excepting new inclusion of immediate family, ie parents, care-

takers, or guardians.  Plaintiff is not seeking access to minors

in any way through visit, nor is he seeking access to a parent in

order that he should gain access to a minor.  Plaintiff seeks

access to adults on an approved list of visitors.  This is some-

thing not covered in IMPP 11-115A; past or current revision.

2.) Defendants state in #8 several reasons for their denial of

video visits, which include, Plaintiff assumes, conclusions

drawn from data contained in Exhibit 24, which Plaintiff has not

been given access to, in order that he could thoroughly analyze and respond.   Yet if disallowing Plaintiff visits via video with adults on an approved list is based on his diagnosis at RDU, Plaintiff points to the fact that none of the qualities of diagnosis have anything whatever to do with adults at all, let alone adults on an approved list, who have all been screened by KDOC and granted visiting privileges.

Without Plaintiff having access to Exhibit 24, Plaintiff is forced to respond based on his own memory and experiences while at RDU, and can only speak from subjective perceptions.  Without being provided the opportunity to examine Exhibit 24, Plaintiff offers the following response to KDOC's RDU process and evaluation:

In October, 1997, Plaintiff signed papers with the Army under the Delayed Entry Program.

In January, 1998, Plaintiff flew to Ft. Jackson, SC and attended Basic Training, followed by Advanced Individual Training (AIT) in Ft. Lee, VA, followed by Parachutist (Jump) School in Ft. Benning GA, prior to being assigned to the 1/508th Airborne Battalion Combat Team (ABCT) in Vicenza, Italy (Caserma Ederle).

In May, 1999, Plaintiff took leave (vacation) and flew back to Colorado to marry Cherry Gookin, a woman he had attended High School with.  Cherry took Plaintiff's last name.

In February, 2000, Plaintiff and his wife had their first child together.  Sognira Jewel Williams was born in a Vicenza, Italy hospital.

In July, 2001, Plaintiff and family relocated to Ft. Leavenworth, KS where Plaintiff was reassigned to the 500th Military Police

2

Detachment.

In September of 2001, Plaintiff and his wife had their second child together.   Brea-Anna Leigh Williams was born in a Lansing, KS hospital.

In August, 2005, Plaintiff and family relocated to Ft. Bragg, NC where Plaintiff reassigned to the 659th Maintenance Company under the Army's 1st Corp. Support Command (COSCOM).

In March of 2007 Plaintiff and his wife had their 3rd child, Sebastian Edward Rey Williams.   Plaintiff was deployed to Al Taqqadum, Iraq, but allowed to take leave for a short time to attend the birth of his son in the hospital located in Ft. Bragg. Plaintiff reassigned to the 264th Combat Sustainment Support Battalion (CSSB), higher echelon for the 659th, subsequent to his Al Taqqadum deployment.

Plaintiff deployed to COB Speicher, Iraq with the 264th CSSB, and shortly after returning to the U.S., in 2010, the Army attempted to reassign him to the 3rd Brigade Combat Team (BCT), 82nd Airborne Division, however were unsuccessful due to Plaintiff no longer jumping out of airplanes, having dropped his jump status.

In August 2010, Plaintiff and his family were relocated to Ft. Benning, GA where Plaintiff served as a cadre member in E-Troop, 5-15th Cavalry Regiment, 194th Armor Brigade through multiple One Station Unit Training (OSUT) cycles.

This arrangement suited Plaintiff's family very well, as it allowed him to be home every night without concern for possibly being sent back to the Middle East.

In February 2014, Plaintiff exited Active Duty honorably (DD214 and resume attached), having served slightly more than 16 years.

3

Plaintiff relocated with his family to Arkansas City, KS "ArkCity where he began a six year contract with the Army Reserves' 451st ESC located in Wichita, KS.

Simultaneous to serving in the 451st, Plaintiff hired on as a procurement specialist with GKN Aerospace located in Wellington, KS.

Plaintiff was pulled over as he returned home from work in February, 2016 by ArkCity cops and placed in handcuffs. Prior to work that morning, Plaintiff hugged each of his three children and told them he loved them and to have a good day at school. They all replied, "I love you too! Have a good day at work." That was the very last time Plaintiff saw his children until the day of his sentencing hearing when his two oldest came forward to speak.

At Plaintiff's sentencing hearing, Plaintiff took the opportunity to tell them before the Court that even though he would not get to see any of them graduate High School or help them learn to drive a car or walk his daughters down the aisle at their weddings, he wants them to know that he loves them with all his heart (see attached, final speech in Court).

Leading up to Plaintiff's arrest, his life was defined by his family and by his career.

Plaintiff asserts before this Court, under Case No. 20-3277-SAC, NOT A DAY goes by that Plaintiff does not think about his children and how he wishes he had a way to travel back in time to erase all the wrongs. Not a day goes by that Plaintiff doesn't wish for a reconciliation, a forgiveness, and a healing.

Plaintiff asserts that every second of his waking moments is lived with the fact that all of the very best things in his life;

4

the good and wholesome and true things, and most of the ones he
loves, have moved on.  Every day Plaintiff actively and force-
fully tells himself to keep his eyes forward, his nose to the
grindstone, his feet firmly planted in doing right, and to push
through this experience that is presently defined by prison walls
and labels that the KDOC and the State of Kansas choose to label
him with.

Plaintiff asserts that what small part of his past life and fam-
ily and friends still remain in his life is more precious to him
than anything, and he holds onto the knowledge that in all the
world there still are a number of people who care about him; that
they exist beyond the crushing weight of the KDOC.

Plaintiff understands that those who still wish to be in his life
do so of their own choosing, and he remains forever greatful for
their love and support.

Plaintiff asserts before the Court that he understands love and
support and forgiveness are things Plaintiff cannot steer or dir-
ect. or control or expect from anyone, regardless of how badly he
wishes for them.

Plaintiff was asked by an RDU evaluator in El Dorado prior to be-
ing assigned to HCF if he would ever communicate with his daugh-
ters, given the opportunity.

Plaintiff answered from the mindset described above, of knowing
how badly everyone is hurting, and knowing that if they ever
reached out to him in coming years and wished for a reconcil-
iation, he would jump at the chance.

Plaintiff asserts that the state of Kansas and the KDOC recognize
the value in reconciled wrongs even for prisoners of his class-

ification, or they would not have regulation and rules governing such reconciliation under their Victim Services Program.

Plaintiff asserts that his answer to the RDU evaluator should not be skewed and misused to claim he intends to contrive an initial contact with victims of his conviction or minors outside his conviction, nor should they skew his words to assume a communication by proxy through others.

Plaintiff asserts that he still loves his children.  He loves them enough to let them go, and he loves them enough to immediately welcome them back if they should ever choose it.

Plaintiff very strongly objects to KDOC personnel so flagrantly, heartlessly, unethically, and deceptively misusing Plaintiff's RDU evaluation response to justify cutting Plaintiff off from video visits with adults already vetted by KDOC and approved for contact; adults who have nothing whatever to do with Plaintiff's conviction.

Plaintiff objects to KDOC using evaluation tools, such as the Static -99 tool to affect a claim they can predict future recidivism, and thereby somehow justify cutting off contact with at least one of Plaintiff's approved visitors.

Plaintiff objects to KDOC using the 9-page single spaced typed document, a cherry-picked synopsis of Plaintiff's criminal investigation, entered by DA Larry Schwartz  at final criminal defense hearing to claim as fact a multitude of things never established in Court.

Plaintiff asserts that he was never given the opportunity to read ANY of the things evaluators claim or wrote during their RDU workup/eval, and their conclusions are skewed, as evidenced by Ms McDonald's responses in the Martinez Report and 18 June filing.

Plaintiff asserts that in all his life, including his time serving in the military with two Combat Deployments, his time incarcerated in Kansas jail and prison has been by far the most violent experience of his life.

Plaintiff has seen inmate on inmate violence, including fist fights, stabbings, beatings, mob attacks, rock attacks, robberies, extortions, suicide, and attempted suicide, etc.

Plaintiff has seen so many instances of administrative abuse of power and authority as well that he has come to coin the term 'purposeful negligence' to define KDOC's Modus Operandi.

Plaintiff asserts that he has never held any illusions of normalcy in a Kansas jail or prison setting, but it is especially troublesome to Plaintiff that the head psychologist and final determiner of Plaintiff's diagnosis and classification in prison would tell Plaintiff that Plaintiff has no hope for a future, that his conviction is a guarantee of failure and trouble, and that if Plaintiff somehow survives his sentence, he would only have a handful of years before natural death, and no hope for a life of meaning.

Although this falls outside the scope of Case No. 20-3277-SAC, it is informative to understand that KDOC often breaks or skews their own rules to fit a moment or favor their choices.

One such example is their IMPP that gives inmates 30 minutes from the time meal line is announced to eat.  HCF further clarifies in local SOP that inmates have 20 minutes from the time served to eat (G.O. attached).  Yet at every meal, every day, the prison guards in the dining hall kick inmates out after 5-10 minutes regardless of whether they are still eating or not, creating

a scenario where every single inmate, every day, for every meal
is actively trying to follow KDOC policy while every working
staff member every day is actively violating their own rules.
Plaintiff asserts before the Court that a misuse of information
such as that contained in Exhibit 24 of Defense's Martinez Report
and an abuse of power reflected in KDOC's violation of Equal Pro-
tections Under The Law and failure of the Turner Standard is at
the heart of KDOC policy regarding video visits.

The Defendants' utter refusal in all steps in Plaintiff's search
for relief through remedy outside direct Court Order, their
attempts to move the goal posts through changes to IMPP 11-115A
after Case No. 20-3277-SAC was filed, their abysmal failure at an
accurate assessment of Plaintiff in RDU, their skew of said
assessment now, and in Martinez Report, skewing and mis-stating
Plaintiff and engaging in various prevaricative posturing in what
Plaintiff assumes are legal perjuries/fictions, and the way they
insist on disallowing Plaintiff access directly to their 'inside
information' presumably contained in their Exhibit 24, only serve
to prove said abuse.

Plaintiff begs the Court note how Defendants so determinedly re-
solve to maintain rules violating Equal Protections Under The Law
and create a rule that fails all four prongs of the Turner Stand-
ard, yet refuse to give answer to their restrictive policies, and
only after delays and extensions attempt to respond in what seems
a not-well-thought-out fashion.

Surely the Court will see that the Defendants' continued refusal
to allow Plaintiff video visits with those vetted and approved
adults on Plaintiff's visit list proves Plaintiff's assertion.

"Although it is the business of correctional officials to main-
tain order within their institutions, they may not restrict the
scope of an inmate's constitutional rights by making automatic
and routine assertions of "discipline and security" in the supp-
ort of restrictive policies.  That is, our deference to the ad-
ministrative expertise and discretionary authority of correct-
ional officials must be schooled, not absolute." (attached)
Plaintiff asserts that Defendants fail at every level to justify
failure of all four prongs of the Turner Standard, and fail to
give answer to their violation of the 14th Amendment Equal Pro-
tections Under The Law.
Plaintiff enters exhibits A-D for review by the Court.  Addition-
al exhibits in this same vein will be    turned over to the Court
as they became available.


        Contained are sworn statements by all approved visitors
of Plaintiff, in addition to possible visit applicants.
Plaintiff prays the Court review statements made by Plaintiff's
family and friends, noting how none of them have been asked by
Plaintiff to communicate with victims of Plaintiff's conviction,
and how most of them have so remote a contact or none at all.
Plaintiff asserts that Defendants assume he is attempting false-
hood and tricks where there are none, simply due to his convict-
ion classification and being warehoused by them.
Plaintiff asserts that Defendants' mistrust and assumption of
deception carries over to a multitude of people not incarcerated,
in their "erring with caution."
Plaintiff asserts that this is unjustified, and an overreach of

authority without cause.

All arguments in Case No. 20-3277-SAC given by Plaintiff still stand. Defendants have failed to address them.

On the claim by Defendants in their Martinez Report that SOTP is no longer a determining factor for override, Plaintiff prays the Court note the reference to attendance on the application for override on the November 2020 update to IMPP 11-115A (attached), which contradicts their assertion that it does not bear in their decision.

Plaintiff asserts that all claims of accurate diagnosis of Plaintiff's sexual proclivities should be sumarily dismissed, and Plaintiff objects to them. Due to the extremely coercive manner in which all evaluations were conducted, such as placing a cop in the room who was leaning forward with his hands on his knees toward Plaintiff, without a lawyer present, as if he was ready to strike, breathing hard at Plaintiff and staring at him in a menacing manner, the evaluators asking leading questions based off data sent them by the DA not argued in Court, Plaintiff knew their minds were made up. Plaintiff and all RDU inmates were threatened by RDU staff that if they did not do what staff wanted, they would be put in the hole at incentive level 0 for the entirety of sentence. Therefore, Plaintiff telling them when asked for his version of things that they apparently already have all the answers in their synopsis cannot reasonably be accepted as a point of fact or admission.

Further, the head psychologist, after his unjustified ad hominem attack on Plaintiff, assigning paraphilic, hebophilic, with extreme possibility of recidivism and anti-social is likewise

absurd, given the fact that Plaintiff was married with 3 children and maintained a robust career and was well-liked.

Further, Plaintiff pled 'no contest' and although the Court considers it equal to a plea of guilt for sentencing purposes, the intent behind Plaintiff's plea was that he did not desire to argue or drag everyone through that process, and therefore did not contest. Plaintiff objects to Defendants now attempting to use that against him.

Plaintiff understands that none of this has much if anything to do with the case at bar, which is not his criminal case or further arguments over RDU processes or negligence, regardless of their unethical nature. Such is the stuff of further scrutiny under another lawsuit.

The case at bar is specifically focused on the fact that the Defendants disallow video visiting privileges with adults on an approved list.

Plaintiff requests the Court review all data contained in Exhibit 24 and strike as surplusage all extraneous data that has nothing to do with adult visitors on an approved list of visitors, as that data, while it may have been a reason for Ms. McDonald to arrive at a faulty conclusion in denial of override, it has no true bearing to the case at bar.

Plaintiff asserts that this is unjustified, and an overreach of authority without cause.

All arguments in Case No. 20-3277-SAC given by Plaintiff still stand. Defendants have failed to realistically address them. Defendants state in #10 that neither Mr. Zmuda nor Mr. Burris were involved in the decision.

11

Defendants seem to imply in their responses that since it was Ms. McDonald who conducted override screening, they are then rendered harmless, when in fact it is a new KDOC rule placed and enforced by the SOC and by the Facility Manager, which drives a requirement for override, misapplying override policy in a rule which IS NOT CONTAINED in IMPP 11-115A (override in order to visit via video ADULTS on an approved list).

Defendants' current policy outside the scope of IMPP 11-115A which does not match the clear intent of IMPP 11-115A; to protect minor victims and minors, is an arbitrary overreach. The fact that Defendants continue to attempt to claim them as one and the same defies logic, as nowhere in IMPP 11-115A does it give instruction for further process to access adults on an approved list through override, and the application of override mentions nowhere access to adults, and the form contains consideration for completion of SOTP.

Defendants state in #11 that Mr. Burris is no longer employed by KDOC. This is news to Plaintiff. But if Mr. Burris' replacement upholds the same standard of abuses as Mr. Burris, his or her name should be added as a defendant under color of state law for the position he or she holds. Plaintiff therefore makes official request for the adding of one such defendant, and if the Court determine Mr. Burris should be stricken from list of Defendants, Plaintiff makes no objection. However, saving the addition of a new name to office of Facility Manager, ALL correspondence by Mr. Burris should be considered as if it had come directly from the SOC, Mr. Zmuda, as Mr. Burris was acting in his official capacity directly on behalf of Mr. Zmuda.

Defendants state in #12-17 calls, emails, letters, etc, used
by Plaintiff.  This has already been thoroughly and successfully
responded to in Plaintiff's rebuttal of Defendants' Martinez Re-
port.  Defendants continuing to show call logs and stamps purch-
ased does not prove valid or viable alternative means of communi-
cation with one who cannot use any of them, but rather proves
Plaintiff's argument of severance to one of his approved contact.
Further, Defendants present questions, starting on page 5 of
their Memorandum in Support.

In "I" of their questions, Plaintiff asserts that it does not
matter whether the Court review revision 2015, 2016, or 2020
of IMPP 11-115A.  The override application very clearly indicates
SOTP as a deciding factor when weighing approval or denial of
override, thus contradicting Defendants' assertion that it does
not.  The statute of limitations does not apply.

In "III," "IV," and "V" of Defendants' questions, Plaintiff
asserts, once again that, "By allowing prisoners in similar sit-
uations with the same classification needs to have visits via vi-
deo, yet disallowing another is a clear violation of the 14th
Amendment of the United States Constitution.  Plaintiff asserts
that the Courts should not fall under the trap of reasoning that
if a state is not under a Constitutional or Statutory obligation
to provide a particular service or privilege, it does not violate
equal protections by providing it to some but not to others.
Constitutionally, the mere fact that a government is not under
obligation to provide a benefit does not excuse its invidious
discrimination among potential recipients after the decision has
been reached to establish the benefit."

Plaintiff's 14th Amendment Equal Protections Under The Law arg-
ument, in its entirety from initial filing, still stands.  De-
fendants offer no viable answer to how Defendants allow certain
of those warehoused as sex offenders access to video visits and
unequally disallow it for Plaintiff, who is of the same class-
ification.

Further, Plaintiff asserts the only reason he has not as yet pre-
sented evidence of other SO's warehoused by KDOC granted override
is that his request for this information was denied as premature,
without prejudice, by the Court due to lawsuit not having entered
'Discovery' phase.  Plaintiff renews his request through the
Court to compel data be served on Court and Plaintiff in a sep-
arate motion.

In Defendants' Arguments and Authorities, Standard on Motion To
Dismiss, page 6-7, Plaintiff asserts that he has overwhelmingly
met the standards of Smith v. United States, 561 F.3d 1090, 1098
(10th Cir. 2009), Bell Atlantic Corp. v Twombly, 550 U.S. 544,
570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), Ridge at Red Hawk,
LLC v. Schneider, 493 F. 3d 1174, 1177 (10th Cir. 2007).
Plaintiff asserts that the Defendants' Motion for Dismissal has
no basis of fact, as Plaintiff has presented a very clear and
concise argument of law violations which raise his right to re-
lief above a speculative level.

Further in Summary Judgement standard, pg 7, Plaintiff asserts
that he has listed several points of contention of Defendants'
so-named 'material fact.'  He has not presented sworn statements
or other discovery due simply to the Court's ruling that this
phase of trial has not been entered while awaiting Defendants'
responsive pleading, due 18 June, which Defendants used for a

14

move to dismiss or summary judgement.

In "I," page 8, Defendants argue Plaintiff used an early re-
vision of IMPP 11-115A to argue his lawsuit, claiming he is
barred by statute of limitations, yet the IMPP's intent to
block communications by inmates via any means (email, phone,
letter, visit) unless overriden specifically to grant communica-
tion with minors is relevant in all revisions, past and present,
and is contained in most recent revision.  Further, override is
still subject to SOTP, as evidenced by its continued inclusion on
override forms, making it a deciding factor regardless of whether
stated specifically thus  in IMPP directive.

In "II," page 9, Plaintiff asserts that Mr. Burris no longer
working for the KDOC does not relieve the KDOC's representatives
who may uphold current policy or direct change to the policy
which abuses clear intent of IMPP 11-115A.  In the absence of Mr.
Burris, Mr. Zmuda shoulders the full burden of responsibility, or
at the least shares it with Facility Manager's current office
holder under color of law.  Mr. Burris did in fact, along with
Mr. Zmuda, have responsible and authoritative power to change
their own policy.  Mr. Zmuda still retains said power by virtue
of his office, as does the person selected to replace Mr. Burris.
Plaintiff asserts that Defendants should not minimize his com-
plaint by stating that "Williams' basis for seeking relief
against Burris is unclear."  Plaintiff's communications were
directed at all times to the Secretary of Corrections.  Mr.
Burris did not allow direct contact, electing to block commun-
ication not only with Plaintiff, but Plaintiff's family (see
remedies, lawsuit).  Further, Mr. Burris acted directly on behalf
of Mr. Zmuda, making him complicit in every aspect of the case at
bar.

In "III," page 10-12, Plaintiff repeats again that"By allow-
ing prisoners in similar situations with the same classification
needs to have visits via video, yet disallowing another is a
clear violation of the 14th Amendment of the United States
Constitution.  Plaintiff asserts that the Court should not fall
under the trap of reasoning that if a state is not under a
Constitutional or Statutory obligation to provide a particular
service or privilege, it does not violate equal protections by
providing it to some but not to others.  Constitutionally, the
mere fact that a government is not under obligation to provide a
benefit does not excuse its invidious discrimination among
potential recipients after the decision has been reached to
establish the benefit."
Further, pertaining to call logs, emails, etc, again, Plaintiff
has already thoroughly responded to Defendants' claims.  Defen-
dants continuing to show call logs and stamp purchases does not
prove valid or viable alternative means of communication, but
rather proves Plaintiff's argument of severance to one of his
approved visitors.
The fact that phone and email and visits and video visits are
allowed across the board makes witholding them for one group or
one classification problematic, and even more so when witheld to
some and granted to others within  a classification.
Further, Defendants asserting on page 12 that the 1st and 8th
Amendment applied in an argument to prison as a whole and in
general can be applied directly to a person is illogical, such
as "the minimal civilized measure of life's necessities."
Plaintiff asserts that he is not engaging in a philisophical

discussion of measures of life's necessities, but rather a very
clear and concise violation of Equal Protections.

Plaintiff asserts that as such, the Court should, contrary to
Defendants' assertion, conduct the Turner analysis, and Plaintiff
strongly objects to their conlusion it should not be utilized.
In "B," page 12, Defendants argue that prohibiting Plaintiff
access to adult visitors on his approved contact list relates
reasonably to a legitimate penological interest.  Plaintiff
asserts that he is not arguing whether APPROVED ADULT CONTACTS be
allowed visits.  Plaintiff asserts that he argues ADULTS VETTED
AND APPROVED FOR VISIT should continue to be approved for visit,
via video and in person.  Plaintiff could have many people on an
approved contact list and send emails to them and write to them
and call them, who are not approved to visit.  Plaintiff's grand-
ma and grandpa Rockel are two such examples.  These individuals
are not approved visitors, as they have not applied for visitor
status.  Plaintiff does not sue the Defendants regarding a dis-
allowing of visits with these contacts.

"Further, the Defendants argue "the very objective of imprison-
ment is confinement" and "many of the liberties and privileges
enjoyed by other citizens must be surrendered by the prison."
While this may be true, and "prison officials are entitled, under
the Turner Standard, to deference if they can show a valid,
rational connection between a rule that restricts certain pract-
ices and a legitimate governmental interest, prison officials
do not have carte blanche to tender reasons which are "arbitrary,
exaggerated, or pretextual."

Defendants offer no ready answer to any of the arguments set
forth in Plaintiff's arguments and authorities, or their

misuse of a valid IMPP to justify witholding access to visits
with approved visitors who are not subject to being witheld under
said IMPP.

Defendants decline to respond to their violation of their own
stated penological interests.  Defendants fail to address their
misuse of IMPP 11-115A and their misapplication of the override
process to determine access to adult visitors already vetted for
visit.

Defendants fail to show how the Courts according "substantial
deference" to prison administrators who define and redefine their
objective in an arbitrary manner, moving the goal posts when it
suits them, is possible.  The instruction is not meant to give
prison officials power to do anything and everything they wish
regardless of violations of protected rights or failure of stand-
ards set forth by the Courts.  Plaintiff reiterates that
"although it is the business of correctional officers to main-
tain order within their institutions, they may not restrict the
scope of an inmate's constitutional rights by making automatic
and routine assertions of "disci·pline and security" in the
support of restrictive policies."  See Campbell v. Miller, 787
F.2d 217, 227, 1986 U.S.)

Plaintiff asserts that Defendants applying the Turner Standard
to IMPP 11-115A on page 13 of their response defies logic!  As
Plaintiff has repeated from the beginning, his argument does not
challenge IMPP 11-115A.  IMPP 11-115A's intent is not to utilize
override procedure designed for application to access children in
order to block visits with adults on an approved list.  Plaintiff
begs the Court note Defendants'continual insistence that Plain-

iff argues something he is not arguing.  Plaintiff asserts that
video visits with adults on an approved list would not and could
not create a scenario of access to minors.  Defendants' argument
has no merit.  Further, Defendants' argument that safety and
security of prison personnel is compromised lacks merit.  Safety
protocols are already well established for visits, as are pro-
cedures for visit by Plaintiff and vetted and approved visitors.
Notably, other than conclusory assertions by Defendants, they
offer no true answer that satisfies Plaintiff's lawful allegation
of failure of Prong 1 of the Turner Standard.  Plaintiff's argu-
ment still stands.

In "i," page 14, Defendants again claim Plaintiff's challenges
relate to IMPP 11-115A.  Plaintiff objects to Defendants
continuing to use language in their arguments that are contrary
to Plaintiff's actual words and allegations and objects to their
creations of false narratives, as such.

Plaintiff objects to Defendants' assertion that he has an
"undisputed" pattern of behavior involving children when in fact
Defendants file under seal a document unchecked, unverified, and
hidden from Plaintiff.  Plaintiff cannot respond in a reasonable
manner to something hidden from review.

Plaintiff asserts that the Defendants' claim to prevent Plaintiff
from interacting with minors is illogical, given the fact that
Plaintiff is asking for access to adults on an already approved
list, not children.  Plaintiff asserts that severing his familial
ties with his aging grandmother has nothing whatever to do with
rehabilitation in any sense and is a gross and flagrant dismissal
of a longstanding penological interest to maintain relational

ties and runs counter to rehabilitation in any sense. (attached)
Plaintiff asserts that Defendants' repeated attempts to tie
severing Plaintiff from his grandmother and disallowing him video
visits with adults on an approved list to protection of children
defies logic and cannot reasonably relate to added restrictions
on visitors already vetted by KDOC for visits.

On page 15, Defendants insinuate that Plaintiff may victimize
children who are not victims of Plaintiff's conviction, although
it is unclear to Plaintiff, as it should be to the Court how
Defendants believe this could be accomplished when safety proto-
cols are already in place for visits via video, and Plaintiff
and approved visitors are subject to them.

Defendants cite no authority granted them that give them free
reign to institute policy so arbitrary, nor that allow them to
restrict the scope of an inmate's constitutional rights.
Defendants fail Prong 1 of the Turner Standard.  Plaintiff's
argument still stands.

At "ii" on page 15 of Defendants' pleading, they suggest that due
to a range of visiting options available to Plaintiff, witholding
video visits does not infringe on ready alternatives.

Defendants claim that Plaintiff argues Defendants should disre-
gard concerns regarding their visit policy due to grandmother's
poor health.  Plaintiff objects to Defendants minimizing and mis-
leading statements.  Defendants provide no viable alternative
manner to communicate with grandmother.  Plaintiff remains sev-
ered, due to unreasonable restrictions to an approved visitor.
Defendants offer case law supporting upheld restrictions of
certain types of communication, yet fail to show the Courts

allowing a rule effectively banning and severing ALL contact
with approved visitors or contacts, as KDOC policy does.
Defendants suggest having a Nursing Home write a letter to
Plaintiff on behalf of his grandmother or "facilitate" a phone
call, claiming this satisfies Turner, yet fail to show how
having a disinterested 3rd party convey messages adequately sat-
isfies.

Defendants fail to show valid alternative means of communication
with at least one of Plaintiff's approved visitors, thus failing
Prong 2 of the Turner Standard.  Plaintiff's argument still
stands.

In "iii" on page 17 Defendants claim a negative impact on prison
guards and inmates, and on protecting children and victims, again
citing IMPP 11-115A.  This IMPP has nothing to do with adults on
Plaintiff's approved visit list.  Defendants claim that allowing
Plaintiff video visits "may result in more children being subject
to victimization" yet fail to show how this could possibly be
accomplished when valid safety and security protocols are est-
ablished and in effect.

Ms. McDonald's assertion that giving Plaintiff access to approved
adult visitors via video enhance the burden of staff to enforce
their rules is without merit.  Plaintiff has given Defendants no
reason to think that he or his family would defy prison visiting
rules, nor that he would throw away a spot in an honor dorm and
a private industries job to violate policy.

Defendants claim that staff would have to "oversee every second"
of Plaintiff's visits.  Plaintiff asserts that apart from it be-
ing the job of staff tasked with overseeing ANY visit, to oversee

*****Sidebar to this dialogue****** (I had to switch systems for the remainder, which is why the font may look slightly different...)

said visits of Plaintiff is not overburdensome. Further, Plaintiff asserts that it would be readily apparent exactly who is on a visit and who is not. It would not take continual scrutiny to do so. Defendants' assertion lacks merit, and cannot show true burden on staff or fellow inmates beyond what is typical of any visit.

Defendants fail to show how granting video visits to Plaintiff negatively impacts children, victims, staff, or other inmates, thus failing Prong 3 of the Turner Standard. Plaintiff's argument still stands.

In "iv" on page 19, Defendants claim that "no easy alternatives exist that would fully accomodate request at de minimus cost to valid penological interests" despite the fact that Plaintiff offers 3 such alternatives which would adequately do so. Plaintiff asserts that the simple fact that Defendants do not wish to roll back an unjustified restriction or consider an approach other than a blanket restriction does not lend their claim merit. Plaintiff asserts that Ms. McDonald's claim video visits are uncontrolled is invalid, as safety protocols are in place and every offender, regardless of classification, is only allowed visits with those on their approved list.

Violating this rule is immediate grounds for visit termination, and further disciplinary procedures against inmate for breaking protocol.

Further, since all approved visitors on Plaintiff's list are adults, there can be no visit, either on purpose or by accident with minors. Nothing in Plaintiff's record indicates he has broken KDOC protocols of visit (or any rules for that matter), lending merit to Plaintiff's assertion that all rules of visit by Plaintiff will be followed.

Plaintiff asserts that the Defendants' claim of requiring more staff to accomodate Plaintiff is likewise without merit, as any failure by Plaintiff or Plaintiff's visitors to follow protocol would result in visit termination.

22

Plaintiff asserts that 3 easy alternatives to Defendants' unjustified, illogical overreach of authority which violates Equal Protections Under The Law and fails all 4 Prongs of the Turner Standard have been provided.

"The existence of obvious easy alternatives may be evidence that the regulation is not reasonable, but an "exaggerated response" to prison concerns. If an inmate claimant can point to an alternative that fully accomodates the prisoners' right at de minimus cost to valid penological interest, a court may consider that as evidence that the regulation does not satisfy the reasonable hardship standard. (see Turner v Safely, 482 U.S. 90-91, 11)

Plaintiff asserts that the theory of "protection of children" and Plaintiff's "rehabilitation" cannot be, as Defendants claim, accomplished by disallowing Plaintiff video visits with adults on an approved visit list. Thus, Defendants fail Prong 4 of the Turner Standard. Plaintiff's argument still stands.

IMPP 11-115A is not being challenged by Plaintiff, as Plaintiff has repeated ad nauseam, due to Defendants' continual insistence to cite it as the source of a rule requiring overrides in order to access adults on an approved list of visitors when no such rule exists in IMPP 11-115A. Rather, the policy requiring override to access children, in order that Plaintiff be granted access to adult visitors on an approved list is at issue, not IMPP 11-115A.

In "IV," page 20 of Defendants' response, Defendants claim that Plaintiff cannot state an equal protection claim, stating that SO's are not a protected classification. However, in Brown v State, 117 Ariz. 476, 573 p. 2d 876 (1978) the Courts held that "The department cannot grant privileges to one group of prisoners and arbitrarily deny the same privileges to another prisoner because it chooses to find its regulations valid in one instance and invalid in another."

Further, "KDOC's capricious design to deprive Plaintiff of the established privilege of video

visits with adult individuals on an approved list under the disguise that Plaintiff must obtain override...is clearly unreasonable, especially in the light that other similary situated inmates are permitted to visit via video through override all approved visitors on their approved lists..." KDOC has implicitly shown invidious discrimination in disallowing Plaintiff visits via video with adults on his approved list, yet allowing prisoners with the same convictions and classification to visit with theirs.

Further, inmates that are housed as SO's are permitted overrides (material fact) to preserve their ability to have visits (video and otherwise) and still obtain that ability.  So it must be held that Plaintiff, and inmates in Plaintiff's classification that are the same as those permitted override are singled out for unlawful oppression, within the same classification. "Exact correlation is neither likely nor necessary."

The fact that Plaintiff has not produced examples of inmates warehoused as sex offenders granted override is, as stated earlier, due simply to denial by the Court of prior request for this information, having not entered discover phase of proceedings.  Renewed request has been entered.

In "B," page 22 of Defendants' responsive pleading, contrary to Defendants' claim that they hold rational basis for denial, for all of the reasons Plaintiff states above, their argument lacks merit. Finally, contact with certain of Plaintiff's family remains severed due to KDOC's violation of Equal Protections.  Defendants fail to accurately or adequately provide alternative means.


CONCLUSION


On this record, Plaintiff asserts that he has shown overwhelmingly the Defendants' decision to

24

disallow him access to adults on an approved list was arbitrary and irrational.  Further, that they violate the Turner Standard's 4 Prongs and violate Equal Protections Under The Law.

In "C" of Defendants' responsive pleading, page 22, Defendants repeat Overton.  Plaintiff again asserts that "Although it is the business of correctional officials to maintain order within their institutions, they may not restrict the scope of an inmate's Constitutional rights by making automatic and routine assertions of "discipline and security" in support of restrictive policies." Defendants' claim that Plaintiff failed to state a claim upon which relief may be granted lacks merit.

Defendants' motion to dismiss or enter summary judgement should be dismissed due to the multitude of error in their claimed "material facts," their failure of the Turner Standard, and their violation of the Equal Protection Under The Law.

Wherefore Plaintiff prays the Court consider Defendants' responsive pleading in light of Plaintiff's effective rebuttal and deny Defendants' motion to dismiss or summary judgement. Further, Plaintiff requests the Court move forward to the next phase of proceedings, or that the Court grant Plaintiff any other relief it finds the circumstances of the case deem necessary, and if the Court finds that a trial is warranted, order it so.  Wherefore Plaintiff prays that the relief request is granted.

Respectfully Submitted,
Darren L. Williams

25